USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/20/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------- X
SANCAK DAVARCI and JOSEPH CHAMBERS,    :
*individually and on behalf of all others similarly*    :
*situated*,    :
    :
    :          20-CV-9224 (VEC)
              Plaintiffs,    :
    :          OPINION AND ORDER
    :
         -against-    :
    :
UBER TECHNOLOGIES, INC.,    :
    :
              Defendant.    :
--------------------------------------------------------------- X

VALERIE CAPRONI, United States District Judge:

      Plaintiffs Sancak Davarci and Joseph Chambers work in New York State as drivers for

the rideshare company Uber Technologies, Inc. ("Uber").  In November 2020, Plaintiffs,

individually and on behalf of a class of all others who work or have worked as Uber drivers in

New York, sued Uber alleging that Uber misclassifies its drivers as independent contractors

instead of employees.  As a result, Uber has, according to Plaintiffs, violated the New York

Labor Law ("NYLL").

      On December 11, 2020, Uber filed a motion pursuant to the Federal Arbitration Act

("FAA"), 9 U.S.C. § 1 *et seq.*, to compel individual arbitration of Plaintiffs' claims and to strike

Plaintiffs' class allegations.  *See* Notice of Mot., Dkt. 13.[1]  Plaintiffs have opposed Uber's

motion.[2]  The critical issue in dispute is whether Uber drivers fall under the exemption to the

---

[1]    In the alternative, Uber seeks to compel arbitration pursuant to New York CPLR § 7501 *et seq.*.  *See* Notice of Mot. at 1.

[2]    Both parties also have filed several notices of supplemental authority — or responses to such notices — to call the Court's attention to relevant decisions on the same or similar issues.  *See* Dkts. 24, 25, 26, 27, 28, 29, 30, 31, 32, 33.

FAA for employment contracts of workers "engaged in foreign or interstate commerce."[3]  9 U.S.C. § 1.  As the so-called gig economy has exploded in recent years, a growing number of courts has considered this precise issue.  A consensus has seemingly begun to develop that rideshare drivers are not exempt from the FAA, although recently a handful of courts have disagreed.

For the reasons set forth below, the Court agrees with the majority of courts to consider this issue: Uber drivers, as a class, are not engaged in interstate commerce and their employment contracts are, therefore, not exempted from the FAA by Section 1's residual clause.  Accordingly, Uber's motion to compel arbitration is GRANTED, and this case is STAYED pending arbitration.

## BACKGROUND[4]

Uber operates a ridesharing platform that matches individuals in need of a ride with drivers willing to transport them to their destination.  Am. Compl. ¶¶ 9–10, Dkt. 12; Declaration of Brad Rosenthal ("Rosenthal Decl.") ¶¶ 4–5, Dkt. 15.  In order to access the Uber ridesharing platform, both riders and drivers must download and use Uber's mobile application, which allows riders and drivers to connect based on location.  Rosenthal Decl. ¶ 6; Am. Compl. ¶ 10.  Drivers are further required to register with a unique username and password, linked to the driver's email account, and to consent to one or more agreements with Uber.[5]  Rosenthal Decl. ¶¶ 7–8, 11; see also Am. Compl. ¶ 13.

---

[3]    The Court will refer to the exemption for workers engaged in foreign or interstate commerce as Section 1's "residual clause" or "residual category."  See, e.g., Wallace v. Grubhub Holdings, Inc., 970 F.3d 798, 800 (7th Cir. 2020); Waithaka v. Amazon.com, Inc., 966 F.3d 10, 16 (1st Cir. 2020).

[4]    The facts set forth below are taken from the parties' pleadings and declarations submitted in connection with Uber's motion.  See Meyer v. Uber Techs., Inc., 868 F.3d 66, 74 (2d Cir. 2017).

[5]    A driver's location determines the specific Uber affiliate with which he or she contracts.  See Rosenthal Decl. ¶¶ 9–10 (stating that New York City-based drivers sign an agreement with Uber USA, LLC (or Uber Logistik,

The most recent driver access agreement is the "Uber Platform Access Agreement," which has been in effect since January 6, 2020 ("January 2020 PAA").  Rosenthal Decl. ¶ 11. Drivers can access the January 2020 PAA through the Uber mobile application, from a computer web browser, or by printing a physical copy.  *Id.* ¶ 12.  Drivers must confirm that they have read and agree to the terms of the PAA two times, on two separate screens, in order to access the Uber mobile application — and thereby be able to work as an Uber driver.  *Id.* ¶¶ 12–13; Ex. A, Dkt. 15-1; Ex. B, Dkt. 15-2.

The January 2020 PAA contains an arbitration provision, which provides, in relevant part:

> (a) This Arbitration Provision is a contract governed by the Federal Arbitration Act, 9 U.S.C. § 1 et seq.[,] and evidences a transaction involving commerce, and you agree that this is not a contract of employment involving any class of workers engaged in foreign or interstate commerce within the meaning of Section 1 of the Federal Arbitration Act. If notwithstanding the foregoing, the Federal Arbitration Act does not apply to this Arbitration Provision, the law pertaining to arbitration agreements of the state where you reside when you entered into this Agreement shall apply. Except as it otherwise provides, this Arbitration Provision applies to any legal dispute, past, present or future, arising out of or related to your relationship with us or relationship with any of our agents, . . . subsidiaries or parent companies (each of which may enforce this Arbitration Provision as third party beneficiaries), and termination of that relationship, and survives after the relationship terminates.

> (b) This Arbitration Provision applies to all claims whether brought by you or us, except as provided below. This Arbitration Provision requires all such claims to be resolved only by an arbitrator through final and binding individual arbitration and not by way of court or jury trial. Except as provided below regarding the Class Action Waiver and Representative Action Waiver, such disputes include without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the formation, scope, enforceability, waiver, applicability,

---

LLC, prior to December 2015), and all other New York State-based drivers sign an agreement with Rasier-NY, LLC, all of which are wholly-owned subsidiaries of Uber).  For purposes of this Opinion, the precise entity with which Plaintiffs signed an agreement is irrelevant, as the operative arbitration provision in both Plaintiffs' agreements is identical, save for the paragraph number.  Def. Mem. at 3 n.8, Dkt. 14; *see also* Rosenthal Decl., Ex D § 14.1; Ex. F § 13.1.

revocability or validity of this Arbitration Provision or any portion of this Arbitration Provision.

(c) Except as it otherwise provides, this Arbitration Provision also applies, without limitation, to disputes between you and us, or between you and any other entity or individual, arising out of or related to your application for and use of an account to use our Platform and Driver App as a driver, . . . the nature of your relationship with us (including, but not limited to, any claim that you are our employee), . . . unfair competition, compensation, minimum wage, expense reimbursement, overtime, breaks and rest periods, and claims arising under the . . . Fair Labor Standards Act, . . . federal, state or local statutes or regulations addressing the same or similar subject matters . . . .

*Id.* at Ex D § 14.1; Ex. F § 13.1.

The January 2020 PAA also contains a "Class Action Waiver," which provides that Uber and all driver-signatories to the agreement "agree to bring any dispute in arbitration on an individual basis only, and not on a class or collective basis on behalf of others." *Id.* at Ex D § 14.4; Ex. F § 13.4.[6]

Notwithstanding the above, the January 2020 PAA sets forth a procedure by which a driver could opt out of the arbitration provision. A disclosure at the beginning of the arbitration provision states, in bold, all-caps text, "**YOU MAY CHOOSE TO OPT OUT OF THIS ARBITRATION PROVISION BY FOLLOWING THE BELOW INSTRUCTIONS**." *Id.* at Ex. D § 14; Ex. F § 13. The January 2020 PAA also includes a standalone section detailing the process by which drivers can opt out of the arbitration provision:

Agreeing to this Arbitration Provision is not a mandatory condition of your contractual relationship with us. If you do not want to be subject to this Arbitration Provision, you may opt out of this Arbitration Provision . . . . To do so, within 30 days of the date that this Agreement is electronically accepted by you, you must send an electronic email from the email address associated with your driver account to optout@uber.com, stating your intent to opt out of this Arbitration Provision, as well as your name, the phone

---

[6]    The January 2020 PAA contains an analogous provision prohibiting driver-signatories from participating in representative actions. *See* Rosenthal Decl., Ex. D. § 14.5; Ex. F § 13.5.

number associated with your driver account, and the city in which you reside.

*Id.* at Ex D § 14.8; Ex. F § 13.8.

Sancak Davarci began working as an Uber driver in 2013.[7]  Declaration of Sancak Davarci ("Davarci Decl.") ¶ 4, Dkt. 20-1, Ex. A.  Davarci accepted the January 2020 PAA on or around January 8, 2020.[8]  *See* Rosenthal Decl. ¶ 18; Davarci Decl. ¶ 10; *see also* Dkt. 15-5. According to Davarci, he "regularly transported passengers from New York into neighboring states, such as New Jersey and Connecticut" while working as an Uber driver.  Davarci Decl. ¶ 6. Davarci estimates that up to 25% of his trips involved transporting passengers from New York into neighboring states and up to 30% of his trips involved transporting passengers to airports, bus stations, and train stations.  *Id.* ¶¶ 7–8.  According to Uber, approximately 5.46% of Davarci's trips began in a different state from which they ended, and Davarci's average trip distance across all completed trips was approximately 5.91 miles with an average trip duration of 19.25 minutes.  Declaration of Juan Manuel Contreras ("Contreras Decl.") ¶ 5, Dkt. 16.

Joseph Chambers began working as an Uber driver in 2017.  Declaration of Joseph Chambers ("Chambers Decl.") ¶ 4, Dkt. 20-1, Ex. B; Rosenthal Decl. ¶ 20.  Chambers accepted the January 2020 PAA on or around January 9, 2020.  Rosenthal Decl. ¶ 21; *see also* Dkt. 15-7. Chambers estimates that he "occasionally transported passengers from New York into Pennsylvania" and that he also "occasionally transported passengers . . . across the United States-

---

[7]      Contrary to Davarci's account, according to Uber, the earliest records of Davarci's work for Uber are from December 2015.  *See* Rosenthal Decl. § 14.  Because Davarci's start date is irrelevant to this motion, and the Court must construe all facts in the light most favorable to the non-moving party, the Court accepts, for purposes of this motion, Davarci's account of when he began working as an Uber driver.

[8]      To the extent Davarci sought to call into question whether he did in fact agree to arbitrate his claims against Uber by stating in his declaration that he exercised his option to opt out of the arbitration provision in his contractual agreement with Uber on December 16, 2019, *see* Davarci Decl. ¶ 9, approximately one month *before* he signed the January 2020 PAA, *see id.* ¶ 10, the Court deems the argument abandoned; Plaintiffs failed to raise the issue in their brief in opposition to Uber's motion, which expressly addressed this issue.

Canada border." Chambers Decl. ¶¶ 6–7. According to Chambers, at least 2% of his trips involved transporting passengers to airports, bus stations, and train stations, which amounted to thousands of trips. *Id.* ¶¶ 8–9. According to Uber, approximately 0.08% of Chambers' trips began in a different state from which they ended, and Chambers' average trip distance across all completed trips was 6.78 miles with an average trip duration of 14.01 minutes. Contreras Decl. ¶ 6.

According to Uber's internal data, nationwide, 2.5% of all trips booked on the Uber app between 2015 and 2019 started and ended in different states. *Id.* ¶ 4. Based on a statistically representative random sample, Uber estimates that the average distance for all trips in the same period was 6.1 miles and that the average duration was 16.6 minutes; those figures increased to 13.5 miles and 30.0 minutes for interstate trips during the same period. *See id.*

Plaintiffs commenced this suit on November 3, 2020. *See* Compl., Dkt. 1. Plaintiffs allege that Uber has misclassified its drivers as independent contractors as opposed to employees in violation of the NYLL. Am. Compl. ¶ 2. On December 11, 2020, Uber moved to compel arbitration, strike Plaintiffs' class allegations, and stay this action pending the completion of arbitration. *See* Notice of Mot. at 1.

## DISCUSSION

### I.   Legal Standard

#### A.  The Federal Arbitration Act

Pursuant to Section 2 of the FAA, "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). The FAA sets forth "a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

*Corp.*, 460 U.S. 1, 24 (1983)).  Because of the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration," and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone*, 460 U.S. at 24–25.

Notwithstanding the wide net cast by the FAA, although "a court's authority under the [FAA] to compel arbitration may be considerable, it isn't unconditional"; it is clear that "this authority doesn't extend to *all* private contracts, no matter how emphatically they may express a preference for arbitration."  *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 537 (2019).  Pursuant to Section 1 of the FAA, among those contracts "exclude[d] from the Act's coverage [are] 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.'"  *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109 (2001) (quoting 9 U.S.C. § 1).  In construing Section 1's residual clause, the Supreme Court in *Circuit City* "applied the statutory canon of *ejusdem generis* to hold that the residual category should be construed as 'embrac[ing] only objects similar in nature to those objects enumerated by the preceding specific words'—i.e., seamen and railroad workers."  *Islam v. Lyft*, No. 20-CV-3004, 2021 WL 871417, at *2 (S.D.N.Y. Mar. 9, 2021) (quoting *Circuit City*, 532 U.S. at 114–15). The *Circuit City* Court also determined that the phrase "engaged in" interstate commerce, as used in Section 1, must be construed more narrowly than other "modifiers" Congress applies to the word "commerce," such as "involving" or "affecting."[9]  *Circuit City*, 532 U.S. at 115.  As a

---

[9]       The Supreme Court's discussion of Sections 1 and 2 of the FAA in *Circuit City* renders the argument proffered in footnote 14 of Plaintiffs' brief not only absurd but also outright misleading.  *See* Pls. Opp. at 12 n.14, Dkt. 20 (arguing that if Uber drivers are not engaged in interstate commerce within the meaning of Section 1, then the FAA does not apply at all, because Section 2 only applies to contracts involving or affecting interstate commerce).  Plaintiffs' counsel is warned that, on more than one occasion, its papers tread awfully close to violating ABA Model Rule of Professional Conduct 3.3(a)(2) by intentionally ignoring directly contradictory, binding precedent.

result, the Court limited the scope of the residual clause to transportation workers engaged in

interstate commerce, which, it indicated, comports with "Congress' demonstrated concern with

transportation workers and their necessary role in the free flow of goods." *Id.* at 119, 121.  The

authority and responsibility rests with the district court to "decide for itself whether § 1's

'contracts of employment' exclusion applies before ordering arbitration." *New Prime*, 139 S. Ct.

at 537.

### B.  Legal Standard on a Motion to Compel Arbitration

In evaluating a motion to compel arbitration, a district court applies a "standard similar to

that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175

(2d Cir. 2003); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).[10]  Summary

judgment is appropriate when "the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  "The summary judgment

standard requires a court to consider all relevant, admissible evidence submitted by the parties

and contained in pleadings, depositions, answers to interrogatories, and admissions on file,

together with . . . affidavits," with the court drawing "all reasonable inferences in favor of the

non-moving party." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (cleaned

---

[10]     Although not raised by the parties, recent case law seems to suggest some disagreement concerning the
appropriate standard to apply on a pre-discovery motion to compel arbitration, especially in the context of whether
rideshare drivers are included within Section 1's residual clause.  In *Singh v. Uber Technologies Inc.*, the Third
Circuit stated that "where the issue of whether the residual clause of § 1 of the FAA applies arises in a motion to
compel arbitration, the motion to dismiss standard applies if the complaint and incorporated documents provide a
sufficient factual basis for deciding the issue."  939 F.3d 210, 218 (3d Cir. 2019).  At least one court in this district
has cited approvingly to *Singh* in describing the standard applicable on an analogous motion.  *See Aleksanian v.
Uber Techs., Inc.*, No. 19-CV-10308, 2021 WL 860127, at *4 (S.D.N.Y. Mar. 8, 2021).  This Court, however, is
unaware of any in-circuit precedent consistent with *Singh*.  In any event, were the Court to consider only Plaintiffs'
complaint, and documents incorporated by reference, and accept all facts asserted therein as true, the Court would
reach the same conclusion as it does after considering the parties' declarations and applying the summary judgment
standard. *See Osvatics v. Lyft, Inc.*, No. 20-CV-1426, 2021 WL 1601114, at *5 n.3 (D.D.C. Apr. 22, 2021)
(deeming *Singh* inapplicable in the D.C. Circuit but determining that the result would be the same under either the
motion to dismiss or summary judgment standard).

up); *see also BS Sun Shipping Monrovia v. Citgo Petroleum Corp.*, No. 06-CV-839, 2006 WL

2265041, at *3 n.6 (S.D.N.Y. Aug. 8, 2006) (stating that it is "proper (and in fact necessary) to

consider . . . extrinsic evidence when faced with a motion to compel arbitration" (citing *Sphere*

*Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 32–33 (2d Cir. 2001))).

"The Second Circuit has established a two-part test for determining arbitrability of claims

not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2)

whether the dispute at issue comes within the scope of the arbitration agreement."  *ACE Cap. Re*

*Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002).  In interpreting an

arbitration agreement, "due regard must be given to the federal policy favoring arbitration, and

ambiguities as to the scope of the arbitration clause itself [must be] resolved in favor of

arbitration."  *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (cleaned

up).

## II.      Plaintiffs Are Not Exempted from the FAA by Section 1

The sole issue for the Court to consider under the FAA is whether Uber drivers fall

within the exemption set forth in Section 1, which states that "nothing herein contained shall

apply to contracts of employment of seamen, railroad employees, or *any other class of workers*

*engaged in foreign or interstate commerce.*"[11]  9 U.S.C. § 1 (emphasis added).  The majority of

---

[11]      In its opening brief, Uber sought to convince the Court that the FAA applies to the arbitration provision at issue, that the class-action waiver is valid and enforceable, and that the parties reserved all other issues, including questions of arbitrability, for arbitration. *See* Def. Mem. at 6–8, 15–19 ("Because the FAA governs this dispute, the Class Action Waiver is enforceable, and because the Arbitration Provision includes a delegation clause for all other issues, there is no other work for the Court to do but compel arbitration.").  Alternatively, Uber argued that the arbitration provision covers the dispute raised by Plaintiffs' claims. *See id.* at 19–21.  In response, Plaintiffs failed to address or oppose any of those arguments, framing the issue as solely whether Plaintiffs, and the purported class they seek to represent, are exempt from the FAA pursuant to Section 1.  Accordingly, having found that Uber drivers are not exempt under Section 1, the Court deems Plaintiffs to have conceded the applicability and impact of the FAA to Plaintiffs' claims, including the class-action waiver contained in the arbitration agreement. *Cf. Jackson v. Fed. Express*, 766 F.3d 189, 194–95 (2d Cir. 2014) (holding that "a partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims").  The Court will therefore compel arbitration on an individual basis and strike Plaintiffs' class allegations. *See Aleksanian*, 2021 WL 860127, at *9 (compelling arbitration where plaintiffs did not dispute that

courts to consider this issue have held that rideshare drivers — including those working for Uber and its primary competitor Lyft — are not covered by the residual clause; that is, they are not exempt from the FAA as a class of transportation workers engaged in interstate commerce. *See, e.g.*, *Capriole v. Uber Techs., Inc.*, No. 20-16030, 2021 WL 3282092 (9th Cir. Aug. 2, 2021); *Osvatics v. Lyft, Inc.*, No. 20-CV-1426, 2021 WL 1601114 (D.D.C. Apr. 22, 2021); *Aleksanian v. Uber Techs., Inc.*, No. 19-CV-10308, 2021 WL 860127 (S.D.N.Y. Mar. 8, 2021); *Hinson v. Lyft, Inc.*, No. 20-CV-2209, 2021 WL 838411 (N.D. Ga. Feb. 26, 2021); *Tyler v. Uber Techs., Inc.*, No. 19-CV-3492, 2020 WL 5569948 (D.D.C. Sept. 17, 2020); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904 (N.D. Cal. 2020); *Heller v. Rasier, LLC*, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020); *see also In re Grice*, 974 F.3d 950, 954 (9th Cir. 2020) (denying plaintiff's petition for a writ of mandamus and holding that district court's decision that Uber drivers did not fall within residual clause of Section 1 exemption was not "clearly erroneous as a matter of law").

In fact, Plaintiffs identify only one court that, prior to March 2021, had bucked the trend and found rideshare drivers to be "engaged in interstate commerce" as that term is used in Section 1.[12] *See Cunningham v. Lyft, Inc.*, 450 F. Supp. 3d 37 (D. Mass. 2020). In recent months, however, two courts in this district have joined *Cunningham* in adopting the view that Section 1's residual clause exempts rideshare drivers from the FAA. *See Haider v. Lyft, Inc.*,

---

they accepted the arbitration agreement and that their claims against Uber fell within the scope of the agreement); *Camilo v. Uber Techs., Inc.*, No. 17-CV-9508, 2018 WL 2464507, at *3 (S.D.N.Y. May 31, 2018) (citing *Epic Sys. Corp.*, 138 S. Ct. at 1624) (striking class allegations pursuant to a class action waiver in plaintiff's agreement with Uber).

[12] A handful of courts have opined on the issue of whether rideshare drivers can fall within Section 1's exemption but have ordered additional discovery before reaching a conclusion as to whether the particular plaintiffs at issue fall within or outside of the exemption. *See, e.g.*, *Singh*, 939 F.3d at 214; *Gonzalez v. Lyft, Inc.*, No. 19-CV-20569, 2021 WL 303024, at *6 (D.N.J. Jan. 29, 2021); *Sienkaniec v. Uber Techs., Inc.*, 401 F. Supp. 3d 870, 872–73 (D. Minn. 2019).

No. 20-CV-2997, 2021 WL 1226442 (S.D.N.Y. Mar. 31, 2021); *Islam*, 2021 WL 871417.[13] Notwithstanding some limited, in-district momentum in favor of the minority position, the Court believes that, in this instance, the majority view is indeed the correct one and holds that Plaintiffs are not members of a class of transportation workers engaged in interstate commerce.

### A. The Interstate Commerce Exemption Applies to Workers Who Transport Passengers

At the outset, the Court rejects Uber's threshold argument that Uber drivers are not included within the Section 1 exemption because they are engaged in the transport of passengers rather than physical goods. *See* Def. Mem. at 14–15, Dkt. 14. In support of its position, Uber relies heavily on dicta from the Supreme Court's decision in *Circuit City*, in which the Court stated that most Courts of Appeals had limited the exemption to "transportation workers," defined as "those workers 'actually engaged in the movement of *goods* in interstate commerce,'" supporting Congress's concern with transportation workers' "necessary role in the free flow of *goods*." *Circuit City*, 532 U.S. at 112, 121 (emphasis added) (quoting *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997)). According to Uber, the majority of courts post-*Circuit City* have relied on those statements from the Supreme Court in holding that the Section 1 exemption applies only to workers who are engaged in interstate commerce through the

---

[13]      Notwithstanding her holding that Lyft drivers as a nationwide class are exempt from the FAA under Section 1, in *Islam*, Judge Abrams determined that New York law provided an alternate basis to compel arbitration. *Islam*, 2021 WL 871417, at *12–14. Although the Court does not reach the issue of whether New York law would compel arbitration of Plaintiffs' claims, the decision in *Islam* is a strong counter to Plaintiffs' arguments that New York courts would not compel arbitration under similar circumstances. *See* Pls. Opp. at 15 ("[I]n the absence of the FAA and federal preemption, New York state law would not allow the enforcement of Uber's arbitration clause."). Judge Abrams recently affirmed her position that New York law compels arbitration in analogous circumstances in denying plaintiff's motion for reconsideration. *See Islam v. Lyft, Inc.*, No. 20-CV-3004, 2021 WL 2651653, at *2–3 (S.D.N.Y. June 28, 2021).

transportation of physical goods, not people.  *See* Def. Mem. at 14–15; *see also* Def. Reply at 6–

7, Dkt. 21.[14]

Recent case law undercuts Uber's characterization, however, with a meaningful number

of courts having decided post-*Circuit City* that the Section 1 exemption covers workers who are

engaged in the transportation of goods and passengers.  *See, e.g.*, *Singh v. Uber Techs. Inc.*, 939

F.3d 210, 214 (3d Cir. 2019)[15]; *Osvatics*, 2021 WL 1601114, at *9–10; *Rogers*, 452 F. Supp. 3d

at 914; *see also, e.g.*, *Haider*, 2021 WL 1226442, at *3 (stating that an "overwhelming consensus

rejects" the argument that "only those who transport goods are engaged in interstate

commerce"); *Islam*, 2021 WL 871417, at *11 ("The Court finds *Singh* and *Rogers* persuasive on

this point and accordingly adopts the view that the Section One exemption does not distinguish

between the interstate transportation of goods and passengers."); *Cunningham*, 450 F. Supp. 3d

at 45 ("[T]he court finds no basis in the statute or in precedent that limits Section 1 to workers

---

[14]        In support, Uber cites *Eastus v. ISS Facility Servs., Inc.*, 960 F.3d 207 (5th Cir. 2020), and *Int'l Brotherhood of Teamsters Loc. Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954 (7th Cir. 2012).  Def. Mem. at 14.  Neither case is particularly persuasive or even relevant to the present dispute.  In *Eastus*, the Fifth Circuit essentially fell back on its pre-*Circuit City* case law, finding that the Supreme Court's decision did not undermine its approach of treating the Section 1 exemption as applicable only to those transporting goods.  *See Eastus*, 960 F.3d at 210–11 (stating that "the pre–*Circuit City* transportation-worker standard" in the Fifth Circuit "remain[ed] operative" because "regardless of the context in which *Circuit City* used the word 'goods,' it did not disapprove of the [Fifth Circuit's] standard").  Further, the *Eastus* court determined that the plaintiff, at best, could be described as loading and unloading airplanes, which distinguishes her from Uber drivers, who in fact transport passengers across state lines.  *See id.* at 212 ("Eastus' duties could at most be construed as loading and unloading airplanes.  She was not engaged in an aircraft's actual movement in interstate commerce.").  In *Kienstra*, the Seventh Circuit did not even address the goods vs. passenger distinction and instead merely quoted the relevant dicta from *Circuit City* in helping define Section 1's residual clause.  *See Kienstra*, 702 F.3d at 956 (quoting *Circuit City*, 532 U.S. at 112).

[15]        In its reply, Uber attempts to distinguish *Singh* based on the fact that the Third Circuit remanded for further proceedings.  *See* Def. Reply at 6.  The Third Circuit, however, explicitly rejected Uber's argument that the residual clause of Section 1 applies only to those who transport *goods* in interstate commerce, holding that "the residual clause of § 1 of the FAA may operate to exclude from FAA coverage the contracts of employment of all classes of transportation workers, so long as they are engaged in interstate commerce, or in work so closely related thereto as to be in practical effect part of it."  *Singh*, 939 F.3d at 221–26.  The *Singh* court remanded to the district court because the record was devoid of any information concerning whether Uber drivers were engaged in interstate commerce; its legal conclusion concerning the applicability of the residual clause to workers who transport passengers was undisturbed by its remand for further factual development.  *See id.* at 226.

who transport goods and that categorically excludes workers who transport passengers as Lyft contends.").[16]

The Court is persuaded that these more recent decisions declining to distinguish between the interstate transportation of goods and passengers have the better of the argument.  There is no basis in the statutory text to distinguish between transportation workers who transport goods and those who transport passengers, *see Rogers*, 452 F. Supp. 3d at 914, nor does the contemporary meaning of the term "commerce" support such a distinction, *Singh*, 939 F.3d at 229–30 & n.2 (Porter, J., concurring in part and concurring in the judgment).  Heeding the Supreme Court's guidance to employ the statutory canon of *ejusdem generis* in defining the residual clause of Section 1, "[b]ecause 'seamen' and 'railroad employees' transport passengers as well as goods, it seems unlikely that Congress intended to limit the residual clause to workers who transport only physical goods."  *Osvatics*, 2021 WL 1601114, at *9 (citing *Singh*, 939 F.3d at 221; *Rogers*, 452 F. Supp. 3d at 914).  Finally, because the Court in *Circuit City* considered only whether the residual clause applies to workers who are not engaged in the transportation industry at all and "did not have the question of passengers versus cargo before" it, it seems unlikely that the Court intended its decision to decree out-of-hand that the Section 1 exemption applies only to workers involved in the transportation of goods; instead, it is far more likely that the *Circuit City* Court "simply used 'goods' as a convenient shorthand to discuss interstate commerce."  *Singh*, 939 F.3d at 224 & n.8.

---

[16]     Uber seeks to undercut the analysis in *Cunningham* by claiming that the court there applied a test promulgated in *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348 (8th Cir. 2005), which is "inconsistent with Second Circuit precedent."  Def. Reply at 6–7.  Uber ignores the fact that, in *Cunningham*, the court did not apply the *Lenz* test in analyzing whether Section 1's residual clause covers workers transporting both goods and people, using the *Lenz* test only to guide its assessment of whether the plaintiffs were engaged in interstate commerce.  *See Cunningham*, 450 F. Supp. 3d at 43–45 (discussing passengers vs. goods distinction); *id.* at 45–47 (assessing "engaged in interstate commerce" issue).  Although this renders *Cunningham* of little help in analyzing whether Uber drivers are engaged in interstate commerce, it does not disturb the district court's reasoned conclusion that the residual clause covers workers transporting both goods and passengers.

Accordingly, the Court finds that the residual clause of Section 1 of the FAA covers workers who transport goods and workers who transport passengers in interstate commerce.

### B.  Uber Drivers Are Not Engaged in Interstate Commerce Within the Meaning of Section 1[17]

Turning to the central issue on this motion, the Court agrees with Uber that Plaintiffs do not belong to a class of workers engaged in interstate commerce within the meaning of Section 1's residual clause.  To begin, the Court notes its agreement with recent decisions that define the level of generality of the class of workers at issue as all Uber (or Lyft) drivers nationwide.[18]  *See, e.g.*, *Capriole*, 2021 WL 3282092, at *6 ("We therefore conclude that we must assess the relevant 'class of workers' here, Uber drivers, at the nationwide level, rather than confine it to any limited geographic region."); *Aleksanian*, 2021 WL 860127, at *7 (concluding that there was no basis to define the class of workers as "New York City Uber drivers" and stating that "the majority of cases involving Uber or Lyft define the class as 'Uber drivers' or 'Lyft drivers.'").

---

[17]     Because the Court concludes that Uber drivers are not engaged in interstate commerce within the meaning of Section 1, it need not address Uber's argument that the January 2020 PAA is not a "contract of employment." *See* Def. Mem. at 13.  The Court notes, however, that Uber has failed to identify any court that has bought its argument that the January 2020 PAA is nothing more than a "license agreement" and is not a contract of employment. *See id.*  To do so, a court would have to determine that Uber's agreements with its drivers, including the January 2020 PAA, establish neither an employer-employee relationship nor an independent contractor relationship, as the Supreme Court has recently made clear that Section 1 of the FAA applies to both equally. *See New Prime*, 139 S. Ct. at 543–44 (holding that the FAA covers "agreements to perform work," including independent contractor arrangements).  Moreover, at least two courts have rejected arguments similar to that put forth by Uber. *See Singh*, 939 F.3d at 217 (holding that "*New Prime* eliminated Uber's 'contract of employment' argument" because Congress used the phrase "in a broad sense to capture any contract for the performance of *work* by *workers*" (quoting *New Prime*, 139 S. Ct. at 541)); *Rogers*, 452 F. Supp. 3d at 913 ("*New Prime* also settled another aspect of the transportation worker exemption: Although section 1 employs the phrase 'contracts of employment,' that term includes 'agreements that require independent contractors to perform work.'" (quoting *New Prime*, 139 S. Ct. at 539)).

[18]     The Court recognizes the "challenging side question" raised by the court in *Osvatics* whether the proper definition of the class of workers is all *Uber* drivers nationwide or "rideshare drivers more generally." *Osvatics*, 2021 WL 1601114, at *11 n.8.  Although the text of Section 1, which speaks of "seamen" and "railroad employees" generally, supports consideration of rideshare drivers as a class without respect to individual company affiliations, here, Plaintiffs assert purportedly meaningful differences between Uber and Lyft. *See* Pls. Opp. at 7 n.8 (stating that Lyft has a 100-mile ride limit, but Uber has no such limit, allegedly demonstrating Uber's involvement in interstate commerce).  Nevertheless, because the result would not be different whether defined as all rideshare drivers nationwide or just Uber drivers nationwide, the Court will accept Plaintiffs' argument and define the class as Uber drivers nationwide.

"The FAA embodies a *national* policy favoring arbitration, and it would be illogical if [Uber] drivers performing the same work for the same company in different cities were to have completely different rights and obligations under the FAA merely because of a happenstance of geography." *Islam*, 2021 WL 871417, at *7 (cleaned up).  This reading of the Section 1 exemption comports with the Supreme Court's instruction that "the residual clause should 'be controlled and defined by reference to the enumerated categories of workers which are recited just before it,'" namely "seamen" and "railroad employees," unbound by geographic limitation. *Osvatics*, 2021 WL 1601114, at *10 (quoting *Circuit City*, 532 U.S. at 115).  The parties appear to agree that this is the proper lens through which to view the issue.  *See, e.g.*, Def. Mem. at 12 (referring to the class as "drivers who use the Uber Driver App")[19]; Pls. Opp. at 1, Dkt. 20 (referring to the class as "Uber drivers" generally); *see also* Pls. Resp. to Def. April 16, 2021 Letter at 1–2, Dkt. 30 (describing the *Osvatics* court's decision to define the relevant class of workers at a nationwide level as a "key holding[]").

An important corollary of this conclusion is that the relevant inquiry is not limited to the experience of the individual Plaintiffs before the Court; in fact, the idiosyncratic patterns of two Uber drivers in New York State are largely irrelevant to the Court's analysis.  Instead, the Court focuses its analysis on the overall class of workers to which Plaintiffs belong, *i.e.*, Uber drivers nationwide.  *See Aleksanian*, 2021 WL 860127, at *6 ("[I]n determining whether the exemption applies, the question is not whether the *individual worker* actually engaged in interstate commerce, but whether the *class of workers to which the complaining worker belonged* engaged in interstate commerce." (internal quotation marks omitted) (quoting *Wallace v. Grubhub*

---

[19]     Uber argues in even broader strokes, referring often to the class as "personal passenger-transportation providers."  *See, e.g.*, Def. Mem. at 9.  It is unclear whether Uber intends this term to be equivalent to rideshare drivers writ large or to pull in an even larger circle of workers, such as taxi drivers, but, as discussed above, it is also irrelevant to the Court's decision.

*Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020))); *Rogers*, 452 F. Supp. 3d at 915 ("The plaintiffs' personal exploits are relevant only to the extent they indicate the activities performed by the overall class.").

Having properly set the contours of the Court's analysis, the issue is whether Uber drivers, as a nationwide class, are engaged in interstate commerce within the meaning of Section 1's residual clause. The Court begins with the text of the statute. *See United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020) ("As with most cases of statutory interpretation, we begin with the text." (citing *Bostock v. Clayton County*, 140 S. Ct. 1731, 1737 (2020))). Here, the Supreme Court's decision in *Circuit City* provides a helpful guide to the meaning of the FAA's Section 1 exemption. *See Wallace*, 970 F.3d at 800–01. The Section 1 exemption must "be afforded a narrow construction," *Circuit City*, 532 U.S. at 118, and "[t]he wording of § 1 calls for the application of the maxim of *ejusdem generis*," *id.* at 114, pursuant to which the residual clause "exempts only workers who are akin to 'seamen' and 'railroad employees,' a category that the Court described as 'transportation workers,'" *Wallace*, 970 F.3d at 801 (quoting *Circuit City*, 532 U.S. at 119).

From this, courts have concluded that transportation workers engaged in interstate commerce are those for whom "the interstate movement of goods is a central part of the class members' job description." *Id.*; *see also Islam*, 2021 WL 871417, at *7 ("[T]o be 'engaged in' interstate commerce means to perform work that at its core involves movement across state lines."). Engagement in the channels of interstate commerce or transportation of goods or passengers in the flow of interstate commerce must be a definitional feature of the workers' job duties, such that the work of the class can be deemed analogous to that of seamen and railroad employees, whose occupations center on the transportation of goods or persons in interstate

commerce.  *See Osvatics*, 2021 WL 1601114, at *12 (citations omitted).  Ultimately, then, "[t]he

nature of the business for which a class of workers perform their activities must inform" the

assessment of whether that class of workers is engaged in interstate commerce.  *Waithaka v.

Amazon.com, Inc.*, 966 F.3d 10, 22 (1st Cir. 2020); *Rittmann v. Amazon.com, Inc.*, 971 F.3d 904,

917 (9th Cir. 2020) (adopting 1st Circuit's reasoning in *Waithaka*).  "In sum, the analysis focuses

on the inherent nature of the work performed and whether the nature of the work primarily

implicates inter- or intrastate commerce."  *Capriole*, 2021 WL 3282092, at *6.

Uber drivers' business does not inherently implicate interstate commerce; the business is

more accurately described as a primarily local, intrastate function.  *See id.* at *8 ("As almost any

user of Uber's product would attest, Uber trips are often short and local, and they only

infrequently involve either crossing state lines or a trip to a transportation hub, as the evidence

demonstrates.").  The vast majority of Uber drivers' trips are purely intrastate.  Contreras Decl. ¶

4 (stating that 97.5% of all Uber trips between 2015 and 2019 began and ended in the same

state).  The data provided by Uber reveal that interstate trips are of largely the same character as

intrastate trips.[20]  *See id.* (noting that interstate trips had an average distance of 13.5 miles and an

---

[20]      Plaintiffs argue that Uber's policies "actively facilitate[] the booking of long trips," distinguishing Uber
from Lyft, which imposes a 100-mile limit on all rides.  Pls. Opp. at 7 n.8.  The article Plaintiffs cite in support of
their argument notes that Uber's company policy does not impose a maximum distance limit for rides but also states
that "drivers always reserve the right to cancel a ride if[,] for example, they don't want to drive to another state."
Harry Campbell, *Just How Far Is Your Uber Driver Willing to Take You?*, Forbes (Mar. 24, 2015),
https://www.forbes.com/sites/harrycampbell/2015/03/24/just-how-far-is-your-uber-driver-willing-to-take-
you/?sh=149ad9cf597c.  The excerpted portion of Uber's policies (for riders) cited by Plaintiffs states only that
Uber recommends riders call their drivers in advance to notify them if they intend to take a long trip.  *See* Dkt. 20-1,
Ex. D.  In any event, "just because Uber is set up to handle the occasional interstate trip does not mean that
'interstate movement of goods is a central part of the job description of the class of workers to which [Plaintiffs]
belong.'"  *Aleksanian*, 2021 WL 860127, at *8 (quoting *Wallace*, 970 F.3d at 800, 803).

Similarly, that a passenger can convince an Uber driver to drive him or her a significant distance does
nothing to distinguish Uber drivers from taxi drivers and does not undermine Uber's data, which indicate that, as an
empirical matter, the vast majority of Uber trips are short, local trips.  Moreover, a long trip does not necessarily
even entail interstate travel.  *See* Campbell, *supra* (noting that the longest Uber ride the author could find was a 320-
mile trip from Santa Barbara, California to Palo Alto, California).

average duration of 30 minutes, as compared to an average of 6.1 miles and 16.6 minutes across all completed Uber trips); *see also Capriole*, 2021 WL 3282092, at *8 (determining that the same statistics provided in this matter "compel the conclusion that Uber's service is primarily local and intrastate in nature"). As the court in *Rogers* neatly summarized:

> [Rideshare] drivers, as a class, are not engaged in interstate commerce. Their work predominantly entails intrastate trips, an activity that undoubtedly affects interstate commerce but is not interstate commerce itself. Although we can safely assume that some drivers (especially those who live near state borders) regularly transport passengers across state lines, the company is in the general business of giving people rides, not the particular business of offering interstate transportation to passengers. Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers.

*Rogers*, 452 F. Supp. 3d at 916 (citation omitted).

Accordingly, the Court finds Uber drivers to be largely equivalent to local taxi drivers for purposes of assessing their engagement in interstate commerce. Moreover, the Court disagrees with Plaintiffs that the Supreme Court's decision in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), is inapplicable. *See* Pls. Opp. at 11 n.13. Instead, the Court joins the many others that have found *Yellow Cab* to be instructive. *See, e.g.*, *Aleksanian*, 2021 WL 860127, at *8 (deeming the reasoning of *Yellow Cab* "just as applicable here" in finding that "'the relationship to interstate transit [of the class of workers to which Plaintiffs belong] is only casual and incidental'" (quoting *Yellow Cab*, 332 U.S. at 231)).

In *Yellow Cab*, in the context of a Sherman Act claim, the Supreme Court held that "when local taxicabs merely convey interstate train passengers between their homes and the railroad station in the normal course of their independent local service, that service is not an integral part of interstate transportation." *Yellow Cab*, 332 U.S. at 233. Because taxi drivers were "required to serve 'every person'" in the city rather than only railroad passengers, and

because taxi drivers did not have any "contractual or other arrangement with the interstate railroads" and their fares were paid and collected separately from railroad fares, the Court determined that taxi drivers' relationship to interstate commerce was "only casual and incidental." *Id.* at 231. As much as Uber (or its drivers) may resist, the reality is that Uber is nothing more than "a technologically advanced taxicab company, allowing people to 'hail' rides from its drivers from pretty much anywhere to pretty much anywhere." *Aleksanian*, 2021 WL 860127, at *7 (cleaned up). The fact that a passenger hails an Uber via an app on his smartphone rather than by standing on the curb with his arm raised or using an old-fashioned telephone to call an equally old-fashioned taxi dispatcher does not alter the fundamental nature of the driver's job.

As the Ninth Circuit recently concluded, then, "Uber drivers, as a class, are not engaged in interstate commerce because their work predominantly entails intrastate trips, even though some Uber drivers undoubtedly cross state lines in the course of their work and rideshare companies do contract with airports to allow Uber drivers to pick up arriving passengers." *Capriole*, 2021 WL 3282092, at *8 (cleaned up).

Plaintiffs' main arguments in support of the position that Uber drivers are exempt from the FAA under Section 1 overlap neatly with the arguments animating the opinions of those courts that comprise the minority view; the Court will, therefore, address these arguments simultaneously.

The minority view certainly has an intuitive appeal. In essence, under the minority view, the fact that rideshare drivers conduct millions of interstate trips per year is more than adequate evidence that rideshare drivers, as a class, are engaged in interstate commerce, regardless of whether cross-border trips are the primary feature of their jobs. *See Islam*, 2021 WL 871417, at

*8 (finding that rideshare drivers conduct up to tens of millions of interstate rides each year, meaning rideshare drivers "perform sufficient numbers of interstate rides, with sufficient regularity, to make them 'engaged in' interstate commerce," "even if interstate transportation is not the predominant daily service provided by rideshare drivers"); *see also Haider*, 2021 WL 1226442, at *3–4 (finding that "the sheer number of interstate trips rideshare drivers make places them 'within the flow of interstate commerce'" and distinguishing cases espousing the majority view by claiming that they reach that conclusion "on an apparent [and allegedly incorrect] instinct that [rideshare drivers'] trips across state lines must be vanishingly rare" (quoting *Circuit City*, 532 U.S. at 118)).  Moreover, rideshare drivers frequently transport passengers to and from interstate travel hubs including airports and train stations, further cementing their place within the interstate chain of commerce.  *See Islam*, 2021 WL 871417, at *9–10.

There is a simple, attractive logic behind this approach.  Unfortunately, however, in this instance, the Court is unable to conclude that the simple answer is the correct one.  Instead, the minority view impermissibly reads all nuance out of Section 1's residual clause and contravenes binding Supreme Court precedent dictating the proper interpretation of Section 1 and Congress's intent in creating a limited exception to the normal reach of the FAA.

Turning first to the argument concerning the frequency with which Uber drivers conduct interstate trips, the Court concludes that rideshare drivers' relationship to interstate transit is no more than "casual and incidental," *Yellow Cab*, 332 U.S. at 231, notwithstanding the fact that "some workers cross state lines in the course of their duties," *Rogers*, 452 F. Supp. 3d at 916; *see also Hinson*, 2021 WL 838411, at *6 ("The crux of this issue is not whether a certain proportion of a person's work is out-of-state, but rather, whether the *entire class* of workers to which the person belongs is a part of the stream of commerce such that it is engaged in interstate

commerce."), and that, in an absolute sense, rideshare drivers collectively make many interstate trips and trips to transportation hubs.

The fact that some members of the class cross state lines is, however, neither necessary nor sufficient to render the class of workers "engaged in" interstate commerce. *See Osvatics*, 2021 WL 1601114, at *12. The raw number of cross-border trips conducted by Uber drivers is largely irrelevant to the ultimate inquiry, which asks not whether a class of workers happen to engage in a threshold number of interstate trips, but whether a central feature of class members' jobs involves interstate commerce. *See Capriole*, 2021 WL 3282092, at *9 (finding that cases adopting the minority view "assign too much weight to the fact that rideshare drivers occasionally perform interstate trips or trips to transportation hubs" and "do *not* consider whether the trips form part of a single, unbroken stream of interstate commerce that renders interstate travel a 'central part' of a rideshare driver's job description"); *Osvatics*, 2021 WL 1601114, at *15 (holding that the "aggregate number or frequency of interstate trips" is not the determinative factor in the Section 1 analysis and looking instead to "whether th[e] class of workers is 'engaged *in the channels* of . . . interstate commerce,' meaning that interstate transportation is 'a central part of the class members' job description' on par with seamen and railroad employees" (quoting *Wallace*, 970 F.3d at 801–02)). Once the Court concludes that interstate trips are merely incidental to Uber drivers' local transportation function, there is no raw number of interstate trips that can transform them into workers who are engaged in interstate commerce. *See Capriole*, 2021 WL 3282092, at *8 ("Uber drivers, even when crossing state lines or transporting passengers to airports, are 'merely convey[ing] interstate . . . passengers between their homes and [their destination] in the normal course of their independent local service.'" (quoting *Yellow Cab*, 332 U.S. at 233)).

A simple example helps to demonstrate the point.  In the course of a bartender's average day, he or she likely spends a good deal of time listening and offering advice in response to patrons' problems.  *See* Susan M. Barbieri, *Shrinks Who Work for Tips*, Chi. Trib. (Dec. 8, 1991), https://www.chicagotribune.com/news/ct-xpm-1991-12-08-9104200545-story.html ("Call them armchair psychologists, the unsung heroes of a lonely, troubled populace.  They are America's service workers — the bartenders, hairdressers, waitresses and others whose jobs call for a willingness to listen when others want to talk about their lives, loves and losses.").  Notwithstanding the frequency with which a bartender — or a hairdresser, etc. — finds him- or herself listening to people's problems and even offering advice, it would not be reasonable to contend that bartenders are "engaged in" the business of therapy or counseling, as the phrase "engaged in" has been interpreted by the Supreme Court in the context of Section 1's residual clause.  This aspect of a bartender's job is incidental to the core feature of their profession: making and serving drinks.[21]

In determining that rideshare drivers are engaged in interstate commerce, *Islam* and *Haider* rely on cases that conclude that interstate travel is not itself necessary to a finding that a particular class of worker is engaged in interstate commerce.[22]  *See, e.g.*, *Islam*, 2021 WL 871417, at *7 n.4 (citing *Waithaka*, 966 F.3d at 26, for the proposition that "workers need not themselves cross state lines to be 'engaged in' the interstate movement of goods or people if they

---

[21]    The Court finds the hypothetical posed in *Islam* similarly helpful.  *See Islam*, 2021 WL 871417, at *7 (stating that federal district judges would uniformly agree that they are "engaged in" conducting criminal trials "notwithstanding that most federal judges' dockets consist primarily of civil actions and the majority of criminal prosecutions are resolved by a guilty plea" because "[o]verseeing criminal trials is unquestionably a 'central part of a [federal district judge's] job description'" (quoting *Wallace*, 970 F.3d at 801)).  The frequency — or infrequency — with which federal district judges preside over criminal trials only affirms the conclusion that the focus must remain on the core features of the class of worker, not a numerical tally of certain tasks.

[22]    As discussed below, the minority view primarily relies on these cases to determine that rideshare drivers' airport trips place them in the flow of interstate commerce.

'transport[] goods or people within the flow of interstate commerce'"). But those cases, in this Court's opinion, directly call into question the minority view's reliance on the raw number of trips rideshare drivers purportedly take across state borders to support the conclusion that rideshare drivers are engaged in interstate commerce. The fundamental teaching from that precedent is that the *nature* of the business involved and whether a worker can be classified as part of the stream of interstate commerce are the lynchpins of the analysis, not the frequency *vel non* with which a type of worker traverses state boundaries. *See, e.g.*, *Rittman*, 971 F.3d at 911–15. Accordingly, those cases support the proposition that flows naturally from the conclusion that rideshare drivers are most closely analogous to taxi drivers and are not engaged in the flow of interstate commerce; that is, the raw number of interstate trips does not change the fundamentally local nature of rideshare drivers' business.

Further, the significant disparity in the raw number of interstate trips for an Uber driver in Miami as compared to a driver in New York City underscores that relying on that metric is a flawed method for determining whether rideshare drivers, as a nationwide class, are engaged in interstate commerce. If anything, this variance suggests that rideshare drivers as a whole are *not* engaged in interstate commerce: that Uber drivers in remote areas or those far from any state borders hardly ever cross state lines whereas those living in border areas do so regularly supports a finding that interstate travel is no more than incidental to an Uber driver's employment, not a core feature. Analogies to the railroad industry and the significant number of railroad employees who never cross state lines do not undercut this conclusion. *See Haider*, 2021 WL 1226442, at *3 (stating that although "[m]any railroad employees work intrastate routes" the exemption covers all railroad employees, "not only those who personally cross state lines"). Railroads are interstate at their core, regardless of the fact that some rail lines are entirely intrastate. *See, e.g.*,

*CSX Transp., Inc. v. Healey*, 861 F.3d 276, 278 (1st Cir. 2017) (referring to the railroad industry as a "quintessentially interstate business"); *Baker v. United Transp. Union, AFL-CIO*, 455 F.2d 149, 153–54 (3d Cir. 1971) (stating that the railroads "remain the backbone of much of our interstate transportation system" and describing the railroads as a "vital link in our nation's commerce").  The same cannot be said for rideshare drivers, whose local character does not become interstate by virtue of the fact that some passengers' trips, while still primarily local, happen to traverse state lines.  *See Capriole*, 2021 WL 3282092, at *8 (contrasting Uber drivers with seamen and railroad workers, for whom "the interstate movement of goods and passengers over long distances and across national or state lines is an indelible and 'central part of the job description.'" (quoting *Wallace*, 970 F.3d at 803)).

        The second pillar of support for the minority view is the frequency with which rideshare drivers conduct trips to and from hubs of interstate travel, such as airports and train stations.  *See Haider*, 2021 WL 1226442, at *4 (finding that "Lyft drivers' trips to air, train, and bus terminals are hardly incidental," and that "[b]oth the quantity and nature of Lyft's connections to hubs of interstate travel lead the Court to conclude that its drivers engage in interstate commerce even when they do not personally cross state lines"); *Islam*, 2021 WL 871417, at *9 (stating that its decision that rideshare drivers are engaged in interstate commerce "is bolstered, if not independently justified, by the fact that the nationwide class of rideshare drivers frequently transports passengers to airports, train stations, and other hubs of interstate travel").  While there is some surface appeal to that notion, the Supreme Court rejected it in *Yellow Cab*.  Although transporting passengers to and from hubs of interstate travel is part of a taxi company's business, "such transportation is too unrelated to interstate commerce to constitute a part thereof."  *Yellow Cab*, 332 U.S. at 230.  "Simply stated, the mere transport of passengers to and from hubs of

interstate travel, however frequently that may occur, is not enough; instead, to be a class of workers that qualifies for the section 1 exemption, there must be an established link between such intrastate rideshare trips and the channels of commerce that are designed to facilitate passengers' interstate journeys." *Osvatics*, 2021 WL 1601114, at *15 (citing *Yellow Cab*, 332 U.S. at 230–33; *Rogers*, 452 F. Supp. 3d at 917); *see also Hinson*, 2021 WL 838411, at *6 ("A taxicab does not transform into an integral part of interstate commerce if, within the scope of its normal course of independent local service, the passenger happens to be beginning or completing an interstate trip." (quoting *Exec. Town & Country Servs., Inc. v. City of Atlanta*, 789 F.2d 1523, 1526 (11th Cir. 1986))).

Both *Islam* and *Haider* rely heavily on *Waithaka* and *Rittman*, in which the First and Ninth Circuits, respectively, held that Amazon "AmFlex" delivery drivers who "locally deliver Amazon packages on the final legs of their interstate journeys" are workers engaged in interstate commerce and thus exempt from the FAA.  *Islam*, 2021 WL 871417, at *9; *see also Haider*, 2021 WL 1226442, at *4.  The Court disagrees that *Waithaka* and *Rittman* support the conclusion that rideshare drivers' trips to hubs of interstate commerce render them part of the channels of interstate commerce.  The crucial feature animating the decisions in *Waithaka* and *Rittman* was the role that last-mile drivers play in the unbroken chain of interstate commerce, all directed by Amazon, whose business is indisputably interstate in nature.  *See, e.g.*, *In re Grice*, 974 F.3d at 957 n.5 (distinguishing AmFlex workers from Uber drivers and stating that the *Rittman* holding was "rooted both in the interstate nature of Amazon's business and in the fact that AmFlex workers complete the delivery of goods that Amazon ships across state lines and for which Amazon hires them to complete the delivery" (cleaned up)).  Plaintiffs' reading of *Waithaka* and *Rittman*, which contends that "'engaged in interstate commerce' only requires that

rideshare drivers transport passengers on the first or last leg of interstate journeys," is thus plainly incorrect.  Pls. Resp. to Def. April 16, 2021 Letter at 2.

Here, Uber drivers' role in transporting passengers to airports and other hubs of interstate commerce is entirely distinguishable from the role played by Amazon's AmFlex drivers. AmFlex drivers continue the last leg of an unbroken, interstate journey overseen by Amazon; Uber drivers are but one, segmented part of passengers' overall journeys.  *See Capriole*, 2021 WL 3282092, at *10 ("[E]ven when transporting passengers to and from transportation hubs as part of a larger foreign or interstate trip, Uber drivers are unaffiliated, independent participants in the passenger's overall trip, rather than an integral part of a single, unbroken stream of interstate commerce like AmFlex workers."); *Hinson*, 2021 WL 838411, at *6 ("Lyft drivers are more like taxi drivers than last-mile delivery drivers of Amazon products, and taxi drivers have been found to have an only casual and incidental relationship to interstate transit." (cleaned up)).  Uber drivers do not engage in conduct that is part of a continuous chain of cross-border transportation controlled or even coordinated by Uber; Uber drivers' role is to provide local rides as part of an independent transaction that, at times, incidentally is part of a larger interstate journey.

Plaintiffs have not put forth any evidence that challenges the Court's conclusion on this issue.  Plaintiffs contend that Uber "partners with airlines and airports to facilitate airport pickups."  Pls. Opp. at 8.  But the fact that airports allow passengers to hail an Uber from "within airport boundaries" does not transform Uber drivers from local transportation providers to part of the continuous flow of interstate commerce.  *See* Uber Technologies, Inc. Form S-1 at 39, Dkt. 20-1, Ex. C.  Similarly unavailing is evidence Plaintiffs have submitted regarding Uber's partnerships with airlines; the fact that airlines may take steps to facilitate their passengers utilizing Uber's service does not make Uber drivers akin to AmFlex drivers.  *See* Dkt. 20-1, Ex.

E (article from March 2017 stating that Uber partnered with Jet Airways *in India* to allow passengers to book an Uber using the airline's app); *id.* at Ex. F (article from August 2014 stating that United Airlines' passengers can access information about Uber via the United app but that passengers will be redirected to the Uber app to reserve a ride).

The Court agrees with Uber that these arrangements, to the extent they are at all relevant to the case at hand, evidence at most "mutually beneficial marketing arrangement[s]" and further cement the conclusion that Uber drivers cannot be considered part of "an unbroken chain of interstate travel." Def. Reply at 5 n.4. In fact, evaluating some of this same evidence, the Ninth Circuit recently stated that "nothing about the submitted materials indicates the type of commercial relationship described in *Yellow Cab* that would implicate interstate commerce." *Capriole*, 2021 WL 3282092, at *9.

Nor is it surprising that Uber has marketing partnerships with airlines and airports. If a meaningful percentage of its *local* fares involve transportation to and from airports, it makes sound business sense to embed advertisements and marketing promotions within airlines' and airports' materials. That does not transmute the portion of a passenger's trip with Uber into a link in an unbroken chain of interstate commerce. *See Osvatics*, 2021 WL 1601114, at *14 (concluding that "the fact that Lyft drivers occasionally and incidentally transport passengers to and from airports and railroad stations does not mean that such drivers are engaged in interstate commerce for purposes of section 1 of the FAA," which is "especially so . . . [absent] evidence that Lyft has a 'contractual or other arrangement' with airlines or railways for Lyft drivers to transport passengers who have taken trips with those companies" (quoting *Yellow Cab*, 332 U.S. at 231)). Plaintiffs' arguments to the contrary notwithstanding, *see* Pls. Opp. at 11 n.13, there remains a meaningful difference between Uber and an airport shuttle company, whose central

(and sole) feature is providing either the first or last step in the flow of interstate transportation of passengers, *see Abel v. S. Shuttle Servs., Inc.*, 631 F.3d 1210, 1216–17 (11th Cir. 2011). "[W]ithout any affiliation with the airlines or other contractual arrangement, Plaintiffs have not demonstrated the practical, economic continuity required to establish that [Uber drivers] are engaged in interstate commerce." *Capriole*, 2021 WL 3282092, at *9 (cleaned up).

In short, by transporting passengers to hubs of interstate commerce, rideshare drivers play a distinct, segmented role, which is itself local in nature. That a certain portion — maybe even a meaningful portion — of their trips involve pick-ups or drop-offs at interstate travel hubs does not transform the fundamental nature of rideshare drivers' job into one in which a central feature of the job is interstate commerce. In other words, the fact that a meaningful portion of *local* trips involves transportation to an airport or train station does not alter the fundamentally local nature of those trips such that Uber drivers are part of the flow of interstate goods and persons.

Having considered carefully the arguments supporting both the majority and minority positions, the Court concludes that Uber drivers are not a class of workers engaged in interstate commerce within the meaning of Section 1's residual clause.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration and to strike Plaintiffs' class claims is GRANTED. This action is STAYED pending the conclusion of

individual arbitration.[23]  The Clerk of Court is respectfully requested to terminate the open

motion at Dkt. 13.

**SO ORDERED.**

Date:   **August 20, 2021**
        **New York, New York**

                                                        **VALERIE CAPRONI**
                                                        **United States District Judge**

---

[23]     Plaintiffs' request that the Court dismiss the case rather than stay it pending arbitration is denied.  *See Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[W]e conclude that the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested.").  Here, Uber explicitly requested a stay pending arbitration.  *See* Def. Mem. at 1, 21; Def. Reply at 10.  In requesting dismissal instead of a stay, Plaintiffs rely entirely on cases that predate the Second Circuit's decision in *Katz*.  *See* Pls. Opp. at 23 n.26.  The Court is skeptical that Plaintiffs' counsel is ignorant of *Katz* — if they are, it seriously calls into question their fitness to even attempt to serve as class counsel in federal court — leading to the conclusion that counsel's advocacy is disingenuous, at best.